Good morning counsel. For the attorneys who are going to be arguing, please step up. Good morning. Jury Tischer on behalf of the defendants, the appellants, Dr. Berk and North Lehane on behalf of Carol Vanderhoof, the special executrix of her late father's estate. Thank you. Ms. Tischer, are you going to reserve some time for rebuttal? Yes, I am. How much time? Four minutes. Okay. Each side will have 20 minutes. Thank you. Good morning. There are certain significant undisputed facts presented in this appeal. The first is that Mr. Vanderhoof needed this surgery. Nobody contests that. There was not an option here not to operate on Mr. Vanderhoof. Every expert testified he needed this surgery. The second undisputed fact here that's also very significant is that an injury to the common bile duct can happen during gallbladder surgery in the absence of negligence. But a physician can exercise all reasonable care during gallbladder surgery, but an injury to the common bile duct can still occur. That's undisputed by all of the expert testimony during this trial. So we can't simply say because the common bile duct was injured that Dr. Burke was negligent. That doesn't work. The issue here is whether in this particular case a reasonable physician could have avoided injury to the common bile duct by exercising the steps that plaintiff's experts set forward. That's the issue. And that issue I'm sorry. Is there a, you know, is there a degree of the injury, though? For instance, when you say that injury to the common bile duct is rather common and it's an expected complication, this isn't, you know, there's nicks, tears, rips, and straight-out transfection, right? Correct. And this is what occurred. He cut it. He didn't tear it, nick it, rip it, bump it. Correct. Right? Correct. So is that a different degree of injury that changes what the standard of care should be? Well, that is driven by the expert's testimony. And the expert in this case said Dr. Burke should have tried these four steps and he couldn't tie any of those four steps to any type of injury to the common bile duct. So it doesn't matter. He gave us the four steps, but then when specifically asked give me your basis, give me your factual basis, tell me how any one of these steps would have prevented any type of injury to the common bile duct, he couldn't do it. And in medical negligence case, as this court well knows, plaintiff has to have that testimony based on a reasonable degree of medical certainty. Well, was it necessary for there to be evidence for the jury to, you know, determine and give weight to evidence that indicated that it could have been preventable or that it would have lessened the chances of cutting the common bile duct? I think that if plaintiff had evidence of either of those things, that would have carried her burden. She did not. Dr. Fink's never said if you had performed this step, that would have allowed the surgeon to find the common bile duct and that would have prevented injury to the common bile duct during surgery. Plaintiff didn't have either type of evidence. What plaintiff had was this conclusion. Dr. Burke, if you had done any one of these four steps, then you may have avoided the injury to the common bile duct, but that conclusion alone isn't sufficient when there's not a factual underpinning to support it. But counsel, don't you see the standard as absolute certainty? Is that what you mean? Right. A reasonable degree of medical certainty. He didn't give that opinion when he went forward with those four steps that never came into the testimony? What he said, he had a conclusory opinion. If Dr. Burke had attempted one of these four steps, then he might have avoided injury to the common bile duct. But then when he was specifically taken through, okay, you said he should have done this, tell me how. The point here is that the deviations that Dr. Fink articulated were either impossible for Dr. Burke to accomplish by Dr. Fink's own testimony or Dr. Fink said, I don't know whether it would have been possible to identify and isolate the common bile duct even if Dr. Burke had attempted those steps. And that's where the fatal void is, the fatal gap is between the alleged deviation and the injury. If Dr. Fink says you should do something that you cannot do by his own testimony, that doesn't bridge the gap. We're going to have to go through these. Did he say by his own testimony that the critical view of safety could not have been complied with? With regard to the critical view of safety, he said, it's possible a surgeon can do his best and not achieve it. I don't know if Dr. Burke would have been able to do the critical view of safety in this case. I don't know. Sometimes you can't do the critical view of safety and it sounds like this was one of those cases. I cannot say that if Dr. Burke had tried the critical view of safety that he could have isolated the bile duct and avoided injury. So on that particular step, it's I don't know, I cannot say. All right. How about the IOC? With regard to the IOC, Dr. Fink starts by saying sometimes IOCs don't work. I would have to speculate to say whether an IOC would have told him where this common bile duct was. I would have to speculate. I cannot say that if Dr. Burke had tried an IOC that it would have made a difference. So with regard to the IOC, he said, I have to speculate and I  We're calling in a physician. Calling in a physician, the third step. This is Dr. Fink's testimony. I cannot say that if Dr. Burke had gotten a consult that it would have made a difference. I cannot say that if Dr. Burke had gotten a consult he would have been able to isolate the duct. And then we have the actual surgeon who came into this procedure after the bile duct was injured, Dr. Baker. And what did he say? He said, if Dr. Burke had called me into this surgery before he injured the common bile duct, there was no way of removing this gallbladder without injuring the bile duct. So we have the expert saying, I can't tell you. And we have the surgeon who came in saying, if I had come in, this same thing would have occurred. Another void in proximate causation. A fatal gap between what we should have done and whether it would have made a difference. Fourth step. Dr. Fink said, well, divide the gallbladder off of the liver, take out as much as you can, and call it good. But he never said whether that was possible and still avoid injury to this common bile duct. He never gave the opinion if he had removed only a part of the gallbladder that he would then have been able to preserve the common bile duct. The difficulty here was finding the common bile duct because of the nature of the condition, the anatomy, the inflammation. You heard the testimony from all of the medical witnesses. His insides were cemented together. His gallbladder was cemented to his liver. His liver was cemented to his common bile duct. It was like trying to look through ice to find two tiny tubes that were the same color of the ice. So what we had here was an expert who was allowed to say, Dr. Burke should have done these four things, but never once established how any one of those four things would have made a difference in this case. He was honest. He was candid. He said, I don't know whether this would have worked. I can't say whether this would have worked. I would have to speculate. And if the expert would have to speculate, then the jury necessarily would have had to speculate. This is a ‑‑ So Dr. Fink said there's four things, four steps I would have taken and this would have satisfied the standard of care in this case. And are you suggesting then that each step, or let me rephrase that, Dr. Fink has to be able to testify that one or more of each individual step, if not whole, the entire four‑step process as a precaution, as a whole, to see if any of these things didn't occur, which is what he said, then it's more likely that the injury could have resulted. Isn't that enough? No. I would point you to the Guske decision where this court addressed different specific deviations. You should have done this, you should have done that. And this court said with regard to each one of those, you need proximate causation testimony. And that's what we have here. Even if we accept that, take them all four together, which we can't because this jury was instructed, if you find one of these things, it was an oral proposition, if you find he failed to do the CVS or failed to do the IOC or, so each one of them do matter individually, but even if you take them all in conjunction, he never said that. He never said if you had done all four of these and never explained if you had done all four of these, how this surgeon could have avoided injury to the common bile duct. Counsel, isn't it a question of what the causal connection is between what the doctor did and what the injury was, not whether or not the doctor could have done it? Well, if you start from the premise that sometimes it can't be done, sometimes you injure the common bile duct even under the best of care. Why do we start with that premise? Because our experts have told us that in this case. The experts have said, this happens. No matter how reasonable the operating surgeon is, this happens. So then you have to look to, well, if you acknowledge that it happens, what would a reasonable physician do to avoid it happening? Cut right away? He didn't cut right away. His testimony How long in the surgery? His testimony was that he was very deliberate, that he tried to tear away the tissue. And we know initially they were going to do a laparoscopic procedure. But as soon as the scope was in there and he saw what he was dealing with, he converted this procedure to an open. Dr. Fink agrees that that was appropriate. He converted to an open so he could get a feel, a better look. And sometimes even then, it's just physically impossible to figure out what's the bile duct and what's the And here again, no one is suggesting that this surgery shouldn't have been performed. So the surgeon is facing a difficult surgery with a known complication under terrible circumstances. And then an expert needs to tell us, this is what he could have done and this is how he could have avoided it. And we do not have that here. We simply don't have it. So at a minimum, wouldn't bringing in an expert or another physician to review what was happening here, at a minimum, isn't that something the doctor should have done? But again, I go back to that's one of the steps that Dr. Fink suggests. And even Dr. Fink said, this is undisputed, Dr. Fink said, I don't know whether that would have made a difference. I don't know whether bringing in another surgeon would have identified that duct to avoid injury. Then we have the specialist who actually testified in this case and he said, if he had brought me in, I couldn't have done any better. There was no way to find this bile duct. So we have that testimony. That's why we are asking you for a verdict for judgment in favor of the defendants. Because there was absolutely no proximate cause testimony for this jury to base its verdict on. If this court determines that we are not entitled to judgment as a matter of law, in the alternative we are entitled to a new trial. We have just reiterated the testimony that Dr. Fink rendered. He had no proximate causation testimony on, I submit, four steps. Even if you find he had it on one, this jury still considered three steps, four steps without any proximate causation testimony. That's inherently prejudicial. When you combine that, we had all of this testimony as to deviations with no proximate causation. You combine that then with counsel's argument. When he told the jury, all I have to prove is that the defendant didn't try. That's not all he had to prove. That's a deviation. He still had to prove causation and injury. All he had to prove was that he didn't attempt. No, that's not all he had to prove. The jury's job here was to base a verdict on the evidence. Telling the jury that I don't have to prove anything other than the defendant failed to try was a misstatement of law and a deliberate plan. He was telling the jury he didn't have to prove something that he had no proof of. There was no proximate causation proof. He suggested to the jury he didn't need it. That's improper. In addition to that, in closing argument, counsel argued several times that the jury needed to protect the community, that the jury needed to act as guardians of the community. Were objections made during those comments? Each different type of argument was objected to on one occasion, Your Honor. In closing? Yes. And was there a ruling made by the court every time? One objection, there was no ruling made. The court said I will instruct you as to the law. With respect to a second objection, it was sustained. But as this court knows, there's a lot of case law that suggests that even if you don't object or even when you object and it's sustained, that there can be so much damage done during an argument of that nature that this court can review the propriety of the arguments. This was the perfect storm. We had no evidence of proximate cause. We had counsel arguing that he didn't need to prove proximate cause. And then we had counsel arguing that the juries needed to be the guardians of their community. This court shouldn't put its stamp of approval on that type of argument. In the alternative, then, we'd seek a new trial on all issues. Finally, if the court rejects our request for judgment and rejects our request for a new trial, we're seeking remitted for the medical expenses that were recovered in this case. There was no 213 opinion on medical bills in this case, not in plaintiff's 213 answers, not in Dr. Fink's deposition testimony. 213 is mandatory. But no opinion on medical records got in. How did those get in? The medical records, the costs, the medical bills, whatever. Is that what you're arguing now? Yes. So how did those get in now? Plaintiff asked for them to be interviewed. Plaintiff, I don't, the bills themselves, I'm sorry, there was a request to admit to which we responded. And we said that these bills are accurate and they are reasonable. But we specifically denied that they were secondary to the defendant's negligence. That third prong was missing. Plaintiff offered them into evidence, if my memory serves, at the close of plaintiff's case. And that's where this dialogue came into play. Defendants objected and said, we found the motion eliminate before trial saying he's got no 213 opinion on this. That was denied. Initially it was reserved. That was denied. We argued at the time of jury instructions. This jury should not be able to consider whether to award medical expenses. There's no foundation for the medical expenses here. That was rejected. Plaintiff's jury instruction was given to the jury with a line item for medical expenses. Wasn't there an expert question about the medical costs, though? He wasn't asked one question about medical expenses. No witness was asked a question about medical expenses. No question was asked. No testimony was rendered as to medical expenses and whether or not it was related to the defendant's negligence. Not one question. So in the alternative, we would ask the remitter in the amount stated in our brief, 360-some thousand dollars were awarded for medical expenses. But I would reiterate, the defendants request this court to enter judgment in their favor in the complete absence of proximate cause testimony. Thank you. Thank you. Good morning again, Your Honors. Let me start off by pointing out a couple of things in response to counsel's presentation. There's no issue before this court on jury instructions. There's no issue raised in the briefs on 213. There is certainly agreement, as counsel began her argument, that an injury to the common barred neck can happen in a surgery this complicated. No question that's undisputed. We agree. But this isn't something that happened accidentally. This happened because Dr. Burke deliberately transected the common barred it was a different structure altogether. He acknowledged before the jury that it was error. The only question is whether or not this fell short of the standard of care required of a reasonably competent surgeon. He acknowledged it. Dr. Baker, the doctor who was called in to the surgery, the second doctor who came in and did the Ruan Y procedure to try and Does that resolve the proximate cause issue? Well, that's one of the three bases that resolves it. Right there. Yeah. Right there. Okay. I said there's additional bases, but that's one of them right there. Dr. Baker, who came in and did the Ruan Y procedure, signed the death certificate. It's another example of proximate cause. Who said it's dial duct injury that led to the death. He identifies it. Now, he retreated from his testimony or his statement of the death certificate at trial. He jumped away from it. Well, the jury had the death certificate. The jury had his testimony. They could consider which one was more credible. So that's the second basis. The third basis is the testimony of the plaintiff's expert, Dr. Finks. Dr. Finks said the four steps have nothing to do with anything. He said the first thing you've got to do is not cut the wrong duct. The four steps are something that you do to try and prevent that bad thing from happening. This is a standard of care issue. It's a matter of if you did all of these things, then you might have a problem saying that you breached the standard of care. He did none of these things, according to Dr. Finks. Now, again, some of these points were contested. The jury heard a contest on the question of whether or not Dr. Burke achieved a critical view of safety, for example. I think, Justice Connors, you mentioned that. I think – Well, just as your opponent says that Dr. Finks says, well, I don't know if this would have made a difference. Is that part of the analysis? It's not. Here's what happens. What Dr. Finks said was you don't cut the common bile duct. To prevent cutting the common bile duct, you have some steps you can take to avoid this calamity. What he said was – and he identified those first steps and he took counsel through them. He was asked in each case, if Dr. Burke had done these things, would it have made a difference? And Dr. Finks said, I don't know because Dr. Burke didn't do it. You can't say it's speculation that was injected here except by the defense. They're asking Dr. Finks to speculate about what might have happened if Dr. Burke had done those things which he needed to do to meet the standard of care. Did he testify that within a reasonable degree of medical certainty that Dr. Burke did not comply with standard of care? Yes, he did. And he said that it led to a domino effect of problems that resulted in Mr. Vanderhoof's death approximately two months later. So that's the approximate cause issue here. We think that's fairly clear. Even Dr. Bynes, who was the defense expert, agreed that it was reasonable to stop and consider other options than, you know, I've got two things here, I'm going to cut one. Let's cut. And the thing about Dr. Burke's testimony was he was very clear that he was not in doubt. You know, I did what I did. I cut it. I was absolutely certain I was doing what I was doing. It turned out to be wrong. I think that's a different situation from the hypothetical that the defense posits that, you know, injuries can happen during surgery. We understand that. But that's not what this case is. So that's the position there. In terms of the bills, I'd like to address that if I can. Can I just go back to? Sure. I just want to make sure I understand your argument of Dr. Fink's testimony on the standard of care. Is it that you're not supposed to cut the common bile duct unless you've taken precautions? Or is it you're not supposed to cut the common bile duct and these steps are what typically are taken, you know, to ensure a reasonable standard of care is given to avoid cutting the common bile duct? All right. I believe the latter situation is what you're saying, Your Honor. I believe what Dr. Fink says is you don't want to cut that at all. That's a bad thing to do. And, in fact, every doctor who testified at trials said it's a bad thing. You don't want to do that. But cutting it isn't proof of abolishment. No, no, no, because that's in and of itself not necessarily valid of the standard of care because of what defense counsels pointed out that, you know, things can go wrong. But he did do it deliberately. And to avoid doing it deliberately, you can take these steps to make sure that you're not making the error. That's the position. If that's responsive, then I'll move on. Turning to the bills, counsel says, well, there was no testimony regarding the bills at trial. That's true. And I'll stand on the exposition of the record in our brief. There was a motion of limine on the bills. It was reserved. There was a number of out-of-the-presence-of-the-jury discussions, which were cited in our brief, where the parties were negotiating basically what the issue was, was there's $426,417 in hospital bills that's, by agreement, we understand those are the hospital bills. The question was how much of this is going to get to the jury. And everybody understood that some portion of it would have to be excluded because if everything had gone entirely according to plan, you know, he's going to be in the hospital for a period of time. So all of that makes sense in terms of you've got to exclude some portion of it. There's negotiations, apparently, that went up right until closing argument about what portion is going to go in. So if counsel is complaining that there wasn't testimony regarding the bills, they invited that. They persisted in negotiating this right up until the jury was ready to hear closing argument. The key on that is … So you're saying there was agreement to enter those bills in evidence? Well, no. Ultimately, the parties did not reach an agreement. There's a second supplemental record that was admitted by this court after the briefs were closed in which there is contained a transcript of a hearing that took place before the jury heard closing argument in which the judge made a ruling and decided to exclude the first week. Now, you know, we had a problem with amending the record after the briefs were closed, obviously. That's not what the rules provide. But, you know, even if you look at that and consider it, the bottom line is the trial court had the discretion to make that determination what to include, what to exclude. And he made that determination. He excluded the first week because of the testimony of Dr. Finks that he would have gotten out of the hospital, Mr. Vandiver would have gotten out of the hospital soon after the surgery but for the baroduct injury. And he did, in fact, get discharged for less than 24 hours about a week after the surgery. So the trial court's decision was to exclude that first week. And that's where the 260 comes from. There can be mischarging or double billing. There can be errors on medical bills, correct? There could be. But, again, these were stipulated to by the parties in terms of the 216 request to admit. They were. Yes. And there was a 216 request to admit early on during discovery that said, you know, are these the bills? Yes, these are the bills. We agree these are the bills. We just don't agree that they're indicative of what our responsibility is or counsel put it the way she wanted to put it. Did they ever want to cross-examine someone on the bill? No. I mean, obviously, they didn't do that. They could have brought the issue to a head a lot sooner than they did. Instead of waiting until the morning of closing argument to bring it out, they didn't do that. If they wanted to raise that issue and cross-examine somebody about the bills, then they could have asked the trial court to make a ruling on that. But they did not. In fact, the night before closing argument, there's a colloquy that's reflected in our brief where they're discussing the bills and whether or not they're going to reach agreement about a stipulated figure to be put to the jury. And the one thing I want to make sure that I get across before I forget is that when trial counsel put up in closing argument his list and filled in the chart about what the medical bills were, there was no contemporaneous objection to the inclusion of that data before the jury. None. Silence. So it's a matter of forfeiture at that point. You have an obligation to raise the objection if you're going to preserve that error. If, indeed, you're going to preserve the claim of error, you've got to say something. They didn't say anything. Counsel, do you agree with your point that all the alleged misstatements that were made in closing were objected to and properly preserved? They raised two groups of them that we covered in the last section of our brief. In four out of five cases, no objections whatsoever were made. In the one case, I'm not sure that there was anything to object to, but the trial court jumped in and said, I will instruct the jury on what the law is. I think it's really a matter of not embarrassing defense counsel by overruling the objection, just saying, okay, jury, I will tell you what the law is. Don't rely too much on what the parties are telling you. And on the second time, he said, no, send a message. Don't send a message. The language, which is quoted, I believe, at page 39 of the plaintiff's brief, isn't there. There's no such send-a-message language. But even if there was, the trial court immediately sustained the objection and admonished counsel in the presence of the jury, curing any error. So that certainly was not a problem. And the final issue that they raised, I don't believe they mentioned it in oral argument, but was the concern about Dr. Baker being an owner of the medical corporation and defense counsel was accorded the privilege of standing up before the jury after close to advise them that this was, in fact, not the case. So all those minor points were covered more than adequately by the trial court. I mean, the law is that you are not entitled to a perfect trial. You are entitled, however, to a fair one. And I believe the parties did get a fair trial here. This was a case of contested testimony on all sides. The jury had a number of factual conflicts to resolve, and the jury resolved them. And I don't believe that this court should accept defense counsel's invitation to interfere with the jury's determinations in this case. And unless there's any further questions, I'll subside. Thank you. Thank you. Thank you, Your Honor. The issue presented to you is not whether the injury to the common bile duct caused the death. That's not the issue. There was disputed testimony on that. I agree. There was disputed testimony on that.   A reasonable physician could have avoided injuring the common bile duct by utilizing any of the four steps that Dr. Fink says Dr. Burke should have utilized. That's where the case fails. He says no one contested proximate cause. No one established it. Plaintiff's own expert candidly admitted with regard to each step, I don't know. I can't say. I would have to speculate. And it wasn't because they weren't tried. Dr. Fink never said, I can't tell you that because they weren't tried. What Dr. Fink said was, I can't tell you that because sometimes in these procedures with findings like this, you simply cannot accomplish it. If plaintiff's argument were to be accepted, then in any case where the plaintiff suggests that the defendant doctor failed to do something, they wouldn't be able to prove their case. Plaintiff wouldn't be able to prove their case because it would be speculative as to what would have happened. We know that's not the case. In case after case, a plaintiff's expert says, you should have performed this test. If you had performed this test, it would have demonstrated this. If it had demonstrated this, you could have given this treatment. That's the testimony a plaintiff needs in a case where they're saying the defendant failed to do something. That's what's missing here. We see it all the time. That's the nature of hypothetical questions. That's the nature of every medical malpractice case where plaintiff is claiming the defendant failed to do something. You didn't hear one sentence in plaintiff's argument about Fink's testimony on proximate cause. You didn't hear one sentence where plaintiff said, this is what Fink said. Fink said if you'd done an IOC, it would have shown this and you could have done that. It's not there. It doesn't exist. Dr. Burke was faced with a complicated surgery. He did the best that he could under the circumstances he was presented with. And you know how we know that? From Dr. Fink's four steps. His four steps inherently recognize that you might not be able to do one or two or three or all four. Listen to what he says. Try one. If you can't get one, try two. If you can't do two, try three. That is an inherent recognition that one, two, three, and four might not work, might not be possible. This court in Aguilera affirmed a JNOV that the trial court entered. In Townsend, vacated a verdict for the plaintiff. In Krivenick, vacated a verdict for the plaintiff based upon the absolute absence of proximate cause testimony just like here. We understand that we're asking for unusual relief. I've never asked for this relief before. But on this record, with the plaintiff's own expert unable to cross that bridge between a deviation and an injury, we're entitled to it. Improper argument. We did object to both different categories of argument. I'll point the court to Supplemental Record Volume 7, 1416, Supplemental Record Volume 7, 1420-21. Both different types of improper argument were objected to. Plaintiff can't get a verdict in this case by arguing that the defendant should have done something that he couldn't do. The defendant can't be liable for failing to try something that wouldn't work. Unless an expert says if he had done this, it would have shown that, it would have prevented this, it simply doesn't matter about what he says we didn't do. With regard to the medical bills, the second Supplemental Record that we submitted to the court contains the trial court's ruling on this issue. The trial court said this goes to the weight, not to the admissibility of the medical bills. He was wrong. There was no foundation for these medical bills. You don't get to weight until you survive the foundational barrier. Plaintiff had, and didn't suggest that he did, there was no question in this record about whether these medical bills were secondary to the defendant's negligence. It wasn't a weight issue. The trial court abused his own discretion. He said, we can't take this huge medical bill and throw it in the jury's lap and have them parse out what's related to the negligence and what's not. We can't do that. And Gill, the Illinois Supreme Court decision, tells us we can't. And then after saying that he couldn't do that, it's exactly what he did. He tossed the bills in the jury's lap and said, figure it out. And the court didn't exclude the first week's worth of medical bills. Plaintiff withdrew them. He withdrew the first week of medical bills because he understood that this was a necessary surgery. That's what would have occurred because of the open nature of the surgery. But even after he conceded he couldn't recover for those bills, that didn't relieve him of his burden of establishing that the remainder of those bills were secondary to the defendant's negligence. He still had that burden even after withdrawing the first week's worth of bills. Counsel, your time on rebuttal is coming to a close. Thank you. Thank you very much for your attention this morning. Again, I would reiterate, we are here asking for a judgment in favor of the defendants and for whatever other relief this court deems just. Thank you. The court thanks both sides for their work in preparing the briefs, their patience in arriving at oral argument. We will take the matter under advisement. Thank you. The court is adjourned.